## CITIZENS' STATE BANK v. FIRST NATIONAL BANK OF GALVESTON ET AL.

### Decided June 24, 1909.

**1.—Injunction—Sale of Mortgaged Property by Junior Mortgagee.**

Ordinarily the rights of a senior mortgagee are not prejudiced by a sale of the mortgaged property under a junior mortgage. The purchaser, having notice of the prior lien, will buy subject thereto, and if the rights of the senior lien holder are jeopardized, he may sequester the property and establish his superior right. But it does not follow that equity will not interfere by injunction to prevent a sale and to hold the property in statu quo when it appears that such action is reasonably necessary to protect the security of the prior lien holder.

**2.—Same.**

Injunction will lie at the suit of the senior mortgagee to restrain a sale under foreclosure proceedings by the junior lien holder when the property, being movable, might become so scattered, or so lose its identity, as to be placed beyond the reach of a writ of sequestration, or to render necessary the issuance of as many writs as there were purchasers of the various articles of the property mortgaged, and the joinder in the foreclosure proceedings of that many defendants.

**3.—Same—Chattel Mortgage.**

Where in the sworn petition for an injunction, by a prior mortgagee to prevent the sale of the cattle under foreclosure proceedings by the junior mortgagee, it was alleged that the debt of the latter had been discharged by the mortgagor, and this was not denied in the pleadings of defendant, and on the hearing the debtor testified particularly as to the manner in which the debt had been paid, which testimony was flatly contradicted by defendant's testimony, the court properly enjoined the sale until the truth or falsity of the allegation could be determined upon final trial.

**4.—Same—Receiver.**

Where an injunction was granted to restrain the sale of mortgaged cattle

by the junior lien holder, on the petition of the senior mortgagees, it was proper for the judge, on proper prayer in the petition, to appoint a receiver and place the cattle in his hands pending the trial.

Appeal from the District Court of Galveston County. Tried below before Hon. Lewis Fisher.

*Wm. B. Lockhart,* for appellant.—If the First National Bank had any right or claim to or against any of the cattle levied upon in said suit by said Citizens' State Bank against Max Stolz, such right would not be prejudiced by the sale of such cattle under the levy in said suit for the reason that, notwithstanding said levy and sale, said First National Bank would be entitled to proceed against said cattle so sold upon the foreclosure of its mortgage. Sparks v. Pace, 60 Texas, 298; Williams v. Farmers' Nat'l Bank, 56 S. W., 261-2, and authorities there cited.

*Maco & Minor Stewart,* for appellee; *Langbehn, Kleberg & Neethe,* for appellee, First National Bank of Galveston.

McMEANS, ASSOCIATE JUSTICE.—Appellee First National Bank of Galveston, on May 6, 1909, filed its petition against Max Stolz, J. H. Langbehn, the Citizens' State Bank and Henry Thomas, sheriff of Galveston County, alleging that defendant Stolz was indebted to plaintiff in the sum of $375, which was secured by a chattel mortgage, dated May 19, 1906, and registered in the chattel mortgage records of Galveston County on same date, upon "20 milch cows, branded with a triangle having a crescent at its base, thus, ⟁, said brand being duly registered in Galveston County, and the said cows being situated on the dairy of the said Max Stolz, on Forty-second street and Avenue P, in the city and county of Galveston, Texas;" that at the time of the execution of said mortgage the defendant, Stolz, was and thereafter became the owner of a large number of cattle, all of which were branded with the same brand. It further alleged that on January 9, 1908, defendant Stolz, being indebted to the Citizens' State Bank in the sum of $1,600, executed to said bank as security therefor a chattel mortgage on fifty head of said cattle, and that this mortgage was duly registered in the record of chattel mortgages of Galveston County; that on December 15, 1907, defendant Stolz, being indebted to defendant J. H. Langbehn in the sum of $2,000, executed to him a chattel mortgage, as security therefor, on seventy-five head of said cattle, but that said mortgage was not filed for registration until September 24, 1908; that thereafter the defendant Citizens' State Bank instituted suit against Stolz in the District Court of Galveston County, to which plaintiff and Langbehn were made parties, and obtained a judgment for the amount of its debt and foreclosure of its mortgage lien upon fifty head of Jersey cows; that thereafter an order of sale was issued on said judgment, and placed in the hands of the sheriff, Henry Thomas, who had levied the same upon and taken into his possession fifty head of cattle to be sold by him under said order of sale, and that notice of sale had been duly given, etc.; "that liens created by all of

,the chattel mortgages hereinbefore more fully set out are wholly inferior to the lien created by the chattel mortgage in favor of this plaintiff on twenty head of said cattle; that it is absolutely impossible to identify which of said cattle under said brand were mortgaged to the other of said mortgagees; that by virtue of said decree and levy the said Citizens' State Bank claims to have established a lien superior to that of the plaintiff herein, and said bank further claims the right, as this plaintiff is informed and believes, to select from all the cattle owned by the said defendant Stolz, and of the brand described in said mortgages, fifty head of said cattle as to it may seem best; and this plaintiff would further show that, owing to the various claims made by the defendants herein, the property on which this plaintiff has a lien may be removed to different counties, and that if the claims of the said defendant Citizens' State Bank are upheld, the property remaining will be wholly insufficient to discharge the debt due from the defendant Stolz to this plaintiff; that for the purpose of a preservation of the property and for the purpose of settling the equities between the defendants and the plaintiff, and to establish the priority of liens to which the various parties in interest may be entitled, a receiver should be appointed to take charge of said cattle pending this litigation, and that during such time the defendant herein, the said Citizens' State Bank, should be enjoined from selling the said cattle levied upon as aforesaid."

The petition concludes with a prayer for the appointment of a receiver and for injunction restraining the sheriff from selling the cattle pending final trial. The petition was duly verified.

Defendant Langbehn filed answer and cross-bill, in which he alleged that defendant Stolz was indebted to him in the sum of $2,500, and to secure same Langbehn had a lien on seventy-five head of Jersey cows and springers, all branded with triangle, thus, ⏇, and being the same brand as that claimed by the Citizens' State Bank as the brand under which it held lien on certain cattle; Langbehn further represented that his mortgage is of prior date to the mortgage of the Citizens' State Bank, though not filed as a chattel mortgage until after Stolz had given mortgage to the Citizens' State Bank. That the mortgage of the Citizens' State Bank has been discharged by said Stolz. That said Stolz had a brand as hereinbefore described, and that said brand is on 100 head of cattle on Galveston Island, which cattle range in value from $15 to $50 per head; that said Citizens' State Bank has undertaken to claim a lien on and sell fifty head of cows, being the best fifty head out of that brand, and that this will operate to prejudice claim of defendant Langbehn, and that the right of the Citizens' State Bank, if any, is merely to select fifty head of cows of average quality and value. Langbehn claimed lien on the same identical cattle as those mentioned and described in pleading filed by the Citizens' State Bank. That Langbehn's mortgage was filed as a chattel mortgage prior to the time that the Citizens' State Bank instituted suit against Stolz mentioned in its pleading filed herein, and said Citizens' State Bank had knowledge of said Langbehn's claim prior to its filing suit against Stolz, and that said Langbehn was not a party to said suit and is not party to suit under which judgment

the sheriff had levied on the cattle now in his possession; that the levy made by the sheriff is not in conformity with the judgment, which judgment forecloses lien on fifty head of cattle in the Moody and Wallis pasture, whereas the sheriff, contrary to said judgment, has proceeded to select fifty head of cattle in said brand, and which cows were in the possession of one Hibbert and one Schaper, and which cows were not in the Moody and Wallis pasture at the time the Citizens' State Bank filed its suit, nor subsequent thereto, and the cattle levied upon by the sheriff are not the cattle described in said judgment. That sale of said cattle would be to the damage and irreparable injury of defendant Langbehn. That said Stolz had approximately 100 head of cattle in said brand, and it would be a great injury and wrong to this defendant to permit the sheriff under said judgment to levy upon and sell fifty head of cows, as the cows left are not of the same value of the cows so selected.

Langbehn adopted the prayer of plaintiff for an injunction and a receiver, and prays that the sheriff and the Citizens' State Bank be enjoined and that a receiver be appointed to take charge of said cattle, and that he be decreed to have a first and prior lien upon said cattle and for judgment of the debt and foreclosure of the lien against all parties.

Defendant Citizens' State Bank answered, setting up its judgment of foreclosure, the issuance and levy of the order of sale, and alleging that the cattle levied upon were not the same as those described in the mortgage of the First National Bank and the superiority of its mortgage over that of defendant Langbehn.

Upon presentation by the plaintiff to the district judge of his petition for injunction, the judge set the case for a hearing, and upon the hearing the following facts were substantially proved:

Max Stolz executed to the First National Bank of Galveston, May 19, 1906, filed for record May 19, 1906, a chattel mortgage on "twenty head of milch cows branded with a triangle having a crescent at the base, thus, ⌂, said brand being duly registered in Galveston County, and the said cows being situated in the dairy property of said Max Stolz on Forty-second street and Avenue P in the city and county of Galveston, Texas," to secure a note dated May 19, 1906, due ninety days after date and payable to the order of W. N. Stowe, cashier, or any renewal thereof.

This mortgage, at the time of the trial, secured a "renewal note" for $375 dated January 21, 1909, due in thirty days, with ten percent per annum interest after maturity, and ten percent attorney's fees. The registered brand of Max Stolz was thus, ▽. Max Stolz executed to J. H. Langbehn September 20, 1907, filed for record September 24, 1908, a chattel mortgage on "seventy-five Jersey cows and springers, branded thus, ▽, and located at Nottingham in what is known as the Moody and Wallis tract," to secure an indebtedness represented by a note for $2,000, in suit in cause No. 27190, District Court, Galveston County, Tenth Judicial District, to which suit Citizens' State Bank is a party.

Max Stolz executed to Citizens' State Bank, December 20, 1907, filed for record January 9, 1908, a chattel mortgage upon "fifty head

of Jersey cows branded with a triangle with a semi-circle over it, point down, thus, ⏀, and located at pasture at Nottingham, known as the Moody and Wallis tract on Galveston Island, Galveston County, Texas," to secure a note for $1,600 of even date, executed by him to said Citizens' State Bank. The District Court of Galveston County foreclosed the lien given in said mortgage upon the fifty head of Jersey cows described in it, and ordered same sold by the sheriff to satisfy the lien.

Neither First National Bank or Langbehn were parties to this suit. An order of sale duly issued in this suit and Sheriff Thomas, in obedience to it, had, before the date of the trial, seized and advertised for sale, in satisfaction of the judgment, fifty head of Jersey cows branded ⏀, which at the time of the seizure were in the pasture at Nottingham known as the Moody and Wallis tract.

Stolz testified that he had from 150 to 230 head of cattle and pretty near all of them were branded with a triangle with a half crescent over it; the same was his registered brand and he used no other. At the time he executed the mortgages no effort was made to point out either twenty, fifty or seventy-five particular head of cows. He had no idea how many head of cattle he had on the date of the trial.

At the time the Citizens' State Bank took its mortgage from Stolz it had no actual knowledge of that of J. H. Langbehn.

Stolz kept cows at his dairy and at his pasture, and when one would go dry would send her to the pasture and bring her back when she became fresh again. He interchanged the cows from the dairy to the pasture and from the pasture to the dairy.

The sheriff did not know how many cattle he found in the pasture when he made the levy. It looked to him like a hundred head or so; there were more than fifty. He didn't go to Stolz first and ask him to pick out fifty head of cattle to be levied on. He didn't know anything about the value of Jersey cattle; he would say as to the comparative value of the cattle he took under the levy and those he didn't levy upon, they were all about the same cattle and about the same value. Stolz thought the best cattle had been taken, but had not been among his cattle since the sheriff made his levy. He had been to his pasture but got there pretty late, and did not get a chance to go all over it, and could not approximate how many cattle were there.

Hibbert testified that there were about four cows left in the pasture after the sheriff made his levy; there were some others in town, and there were some few running on the range. There were some in the Denver Re-survey; that those left in the pasture were not worth anything.

Stolz testified that he sold and delivered to Juneman thirty cows and his dairy route in the city of Galveston for $1,600; that he drew a draft on Juneman for $1,500 of that amount and delivered the draft to Robert Ingram, President of the Citizens' State Bank; that his purpose in so doing was to cancel the mortgage held by said bank on the fifty head of cattle; that the draft was in full payment of the amount secured by the mortgage; that Ingram accepted the draft as settlement of the debt due the Citizens' State Bank; that the sale was made to Juneman on September 2, 1908, and the draft was delivered to

Ingram about September 3, 1908; that when he delivered the draft to Ingram it was to cover his indebtedness to the Citizens' State Bank, and that it was so understood between himself and said Ingram representing said bank. Ingram denied that he accepted the draft in settlement of Stolz's indebtedness to the bank, but declared that he had taken the draft for collection only, and that, having failed to collect the amount from Juneman, he subsequently returned the draft to Stolz.

After hearing the evidence, the district judge in chambers granted the injunction in the terms of the prayer of the plaintiff and of defendant J. H. Langbehn, and appointed a receiver of the property. From this order the defendant Citizens' State Bank has appealed.

Appellant presents in its brief several assignments of error, to consider which in detail would, we think, serve no useful purpose.

There is no question that the mortgage of the First National Bank on the property described in it is superior to the mortgages of the Citizens' State Bank and of Langbehn, in so far as the two mortgages last named embrace the same property as that described in the mortgage of the First National Bank.

Appellant contends that as the mortgage of the First National Bank describes the cows as being branded with an inverted symbol of the brand used by Stolz, the description does not embrace the property described in its mortgage. Whether it does or not, and whether such description affected junior lienholders with constructive notice of the prior mortgage, are matters which this court will not undertake to determine on this appeal, but leave them for the lower court to decide upon a trial of the case on its merits.

Ordinarily the rights of a senior mortgagee are not prejudiced by a sale of the mortgaged property under a junior mortgage. The purchaser, having notice of the mortgage lien, would buy the property subject thereto. If after the purchase the rights of the senior lienholder are jeopardized, he may sequester the property in a suit against the mortgagor, and make the purchaser a party, and in the proceeding establish his superior right to the property as security for his debt. But it does not follow that equity will not interfere to prevent a sale and to hold the property in *statu quo* when it appears that such action is reasonably necessary to protect the security of the prior lienholder. This would be proper in any case when the property, being movable, might become so scattered, or so lose its identity, as to be placed beyond the reach of a writ of sequestration, or to render necessary the issuance of as many writs as there were purchasers of the various articles of mortgaged property, and the joinder in the foreclosure proceedings of that many defendants. In the instant case it is shown that the sheriff had levied upon, and advertised for sale, fifty head of Jersey cows. In making the sale the sheriff would have the right, unless directed otherwise, to sell them singly. The purchasers could, unless prevented by proper process, remove their purchases out of the county or State, or conceal the same so that it could not be found, and by so doing defeat the plaintiff's lien or entail unnecessary trouble and expense upon it in subjecting the property to its mortgage. Under the circumstances we do not think that it was error for the judge by in-

junction to maintain the *status quo* until the equities of the parties can be determined on final trial.

But if there should exist a doubt of the right of the First National Bank under its sworn pleading and the evidence, to the issuance of the injunction, we certainly think that there can be no question of the correctness of the judge's order granting the writ upon the sworn cross-bill of the defendant Langbehn, one of the allegations of which is that the mortgage of the Citizens' State Bank had been discharged by Stolz. This allegation was in nowise denied by the Citizens' State Bank in its pleadings. Upon the preliminary hearing Stolz testified particularly as to the manner in which the debt had been paid. While his testimony was flatly contradicted by the testimony of the other witnesses, nevertheless the sworn allegation of Langbehn's cross-bill, that the debt had been paid, not being controverted by the answer of the Citizens' State Bank, must be taken as *prima facie* true, and therefore the judge's order enjoining the sale until the truth or falsity of the allegation could be determined upon final trial was properly made. Having enjoined the sale, it was proper for the court to place the cattle in the hands of a receiver pending the trial. The order appealed from is affirmed.

*Affirmed.*